# Exhibit A



Eric Aden, *Okaloosa County Sheriff*

Headquarters: 50 2nd Street, Shalimar Florida 32579-1234
Phone: (850) 651-7410, Email: Sheriff@sheriff-okaloosa.org

### Office of Professional Standards
### Administrative Investigation

---

Date:       May 30, 2024

To:         Sheriff Eric Aden
            Undersheriff Charles Nix
            Chief Deputy Kenneth LaPee
            Major Kevin Kirkpatrick

From:       Captain Robert Wagner

Subject:    Final Investigative Report
            IA 2024 - 012
            Deputy Eddie Duran

---

**Background:**

In accordance with Okaloosa County Sheriff's Office (OCSO) General Orders 04.01 - Response to Resistance and 04.02 - Firearms Policy, an administrative review by the Office of Professional Standards (OPS) was conducted of an Officer-Involved Shooting (OIS) involving OCSO sworn member Deputy Eddie Duran, who discharged his agency issued handgun on May 3, 2024, at or around 1632 hours.

The administrative review of the incident included reports prepared and submitted by OCSO investigators, response to the scene, documented evidence, and official statements. The OCSO Criminal Investigations Division (CID) started to investigate the OIS incident prior to the investigation being turned over to the Florida Department of Law Enforcement (FDLE). OCSO's partial criminal investigation is documented in OCSO24OFF005964 (Exhibit 1).



The Okaloosa County Sheriff's Office is accredited by the Commission for Florida Law Enforcement Accreditation.

The Okaloosa County Sheriff's Office provides equal access and equal opportunity in employment and services and does not discriminate.

**Involved Parties:**

1. Deputy Eddie Duran
   - Deputy who shot Mr. Fortson.
   - Deputy Duran was first employed by OCSO in July 2019. He resigned in November 2021, and then returned in June 2023.
   - Deputy Duran was current on Response to Resistance training, which was last completed on June 28, 2023.
   - Deputy Duran was current with his agency firearm qualification, which was last completed on June 8, 2023, with iron sights, and again on September 7, 2023, with the pistol mounted optic sight.
   - Additional training completed by Deputy Duran includes:
     - Active Assailant refresher training on October 22, 2023.
     - Florida Criminal Justice Executive Institute (FCJEI) Discriminatory Profiling / Human Diversity / Professional Traffic Stops training on October 25, 2023.
     - FCJEI Domestic Violence on November 4, 2023.
     - Active Shooter training on November 11, 2023.

2. Mr. Roger Fortson
   - Resident of the apartment Deputy Duran was dispatched and directed to.
   - Subject who answered the door with a firearm in his right hand.
   - Subject shot by Deputy Duran.

**Narrative:**

On May 3, 2024, at approximately 1624 hours a call for service was received concerning a disturbance in progress (Exhibit 2). Minutes before OCSO received the call for service, ███████, the neighbor residing ██████████ Mr. Roger Fortson's 1401 apartment, called the apartment complex's main office to report hearing a disturbance in the apartment ██████ her. This call was recorded by the apartment complex (Exhibit 3). ███████████, an employee of the apartment complex, answered the call. ██████████ reported, "I live in ██ and my neighbors ██████ are arguing. I feel like they're getting a little handsy. … The people ██ me, they've been arguing for like thirty minutes. … Maybe they do that for a while, but it sounds like it's getting a little handsy. I don't know what to do. I don't want to go ██ there and, you know, make it a little [unintelligible]."

██████████ told ██████████████ could call the police, but the apartment complex could not make contact with the neighbors. ████████ did not say she would call law enforcement, and she did not call law enforcement until after she heard shots fired. ██████████, however, did call the OCSO non-emergency line to report the disturbance. ██████████ call into the OCSO Communications Center was recorded (Exhibit 4).

While reporting the disturbance, the OCSO communications officer asked for the address of the disturbance. ████████████ answered, "It's going to be 3, 319 Racetrack Road Northwest is the exact address of the building, and then the apartment number's going to be 1401." The communications officer asked if they were still fighting, and ████████████ replied, "Yes. I literally just got off the phone with her. She said that it's been going on for like 15 to 20 minutes, and she said that, she called right; when she called me, she said that she was calling me because it sounded like it was starting to get out of hand, and it sounds like a man and a woman." Communications asked if it was physical, and ████████████ said, "She said that it sounded like it started getting physical."

████████████ added, "A few weeks ago I was walking on the sidewalk, like it was close to their apartment, and I was hearing like someone, like a guy yelling at a girl saying like, shut the fuck up, like you stupid bitch, or something like that, but I couldn't tell where it was coming from. So, by what she's saying, that might have been them."

OCSO Communications dispatched the call through their Computer Aided Dispatch (CAD) system (Exhibit 2) to Deputy Eddie Duran's Mobile Computer Terminal (MCT) in his patrol vehicle, and over radio (Exhibit 5). The following are portions of the radio traffic. Communications is listed as CM, Deputy Eddie Duran is listed as ED, Corporal Casey Duh is listed as CD

> CM: 312 [Deputy Duran's radio number] copy disturbance, physical in progress, zone 16.
>
> ED: Go ahead.
>
> CM: Be 319 Racetrack, 319 Racetrack. Going to be unit 1401, 1 4 0 1. All we got for notes is physical, still receiving.
>
> ED: 10-4.
>
> CD: 111 [Corporal Duh's radio number] divert to back.
>
> ED: 312 10-97 [on scene].
>
> CM: 10-4, 10-97. Don't have, uh, any further other than a male and female. It's all fourth party information through the front desk at the leasing office.
>
> ED: 10-4.

The following events were captured on Deputy Duran's Body Worn Camera (BWC) (Exhibit 6). For this section of the BWC review, times will be reported as shown on the video and will be in military time with the format of hours : minutes : seconds.

> 16:28:22 – Deputy Duran made contact with two gentlemen in the apartment complex leasing office. He was told the leasing agent had stepped out of the office.
>
> 16:28:30 – Deputy Duran asked, "What's going on?" One of the gentlemen answered he was not sure.

16:28:38 – Deputy Duran questioned, "So, there was a fight going on, or something?" The other gentleman said he was not present for a fight; he was unaware if a fight had occurred.

16:28:57 – Deputy Duran made contact with ████████ in the parking lot north of Building 319.

16:29:01 – Deputy Duran asked ████████ "Are they fighting or something?"

16:29:02 – ████████ answered, "That's what the ████████ neighbor said; that, she was saying that it happens frequently, but this time it sounded like it was getting out of hand."

16:29:09 – Deputy Duran asked, "Okay, which door?"

16:29:14 – Instead of answering Deputy Duran's question, ████████ first relayed an incident which had occurred a few weeks earlier. She said, "So, I'm not sure, two weeks ago I was walking by, like by their apartment basically, on this side, and I was hearing someone yell, like, shut the fuck up, like your stupid B word and all this other stuff, and I heard a slap like right after it, but I wasn't sure where it came from, and I couldn't call, like I didn't want to call the police, and you know."

16:29:33 – Deputy Duran asked again, "Which room is it?"

16:29:34 – ████████ answered, "1401."

16:29:35 – Deputy Duran confirmed, "1401, okay."

16:29:39 – ████████ reiterated, "1401."

16:29:40 – ████████ added, "But the girl ████ sounded scared, the one that called. She said, she was like, it's getting out of, it sounds like it's getting really out of hand."

16:29:46 – ████████ and Deputy Duran were standing in front of an elevator. Clarifying the floor he was to go to, Deputy Duran asked, "Just hit number four, huh?"

16:29:47 – ████████ answered, "Yeah."

16:29:48 – Deputy Duran requested, "Okay. Do me a favor, will you stand out there and direct the other deputy that's coming to this area."

16:29:57 – Deputy Duran was in the elevator, and he pushed the button for the fourth floor.

16:30:22 – Deputy Duran exited the elevator onto the fourth floor. Outside the elevator, the floor number "4" is clearly displayed.

16:30:29 – Deputy Duran entered an outside hallway which had a placard with an arrow pointing the direction towards apartments 1401 and 1402, the only two apartments located in the direction Deputy Duran walked.

16:30:39 – Deputy Duran entered an open-air breezeway on the fourth floor of the apartment building. He walked south in the breezeway. To his right was the wall of the building. To his left was a white, metal balcony rail. Past the rail, the east parking lot could be seen four floors down.

16:30:45 – Deputy Duran passed the door to apartment 1402 on his right.

16:30:54 – Deputy Duran passed an open stair well on his left as he approached the door to apartment 1401.

16:30:56 – Deputy Duran was in front of the door for apartment 1401. There is a clear placard just to the left of the door (directions in relation to the door are from the perspective of facing the door) and near eye-level with 1401 displayed. Just past the door, there is another balcony railing. Beyond the railing is a four story drop to the ground.

16:30:58 – Deputy Duran leaned closer to the door of 1401 in an effort to listen.

16:31:16 – Deputy Duran knocked on the door for the first time.

16:31:17 – Deputy Duran moved back, left of the door towards the small railing on the south side of the breezeway. A dog inside of 1401 barks.

16:31:23 – Deputy Duran moved north, crossing in front of the door, and positioned himself to the right side of the door.

16:31:31 – A voice from inside apartment 1401 could be heard. The voice was not clear, but possibly said, "Who is it?"

16:31:41 – The voice could be heard again. The voice was not clear, but possibly said, "How the fuck the police…"

16:31:46 – Deputy Duran knocked on the door for the second time. After knocking, Deputy Duran loudly said, "Sheriff's Office, open the door." He remained right of the door.

16:31:51 – Deputy Duran crossed the door again, and positioned himself left of the door.

16:31:55 – Deputy Duran knocked on the door for the third time. After knocking, Deputy Duran for a second time loudly said, "Sheriff's Office, open the door."

16:32:00 plus 2 frames (0.066 seconds) – The door started to open.

For the next ten seconds of Deputy Duran's BWC video, it is broken down by the individual frame counts where possible. The BWC video captures thirty frames per second meaning the frames are 0.033 seconds apart. Counting the frames allows for a relatively precise time record. The following events are described from Deputy Duran's BWC video starting with a time marker of 0:00.000 when the door starts to open in the format of minutes : seconds . thousandths of a second (as there is no audio when clicking frame by frame, audio times are less precise; therefore, audio time stamps will only be shown with time stamps to the tenth of a second):

0:00.000 – The door started to open.

0:01.6   – Deputy Duran said, "Step back."

0:03.168 – Deputy Duran's firearm came into frame.

0:03.300 – Mr. Fortson's right hand and his firearm came into frame. The firearm is
down at his side pointed straight down. Mr. Forston's left hand began raising
with his palm facing outward.

0:03.432 – Deputy Duran discharged his firearm. A slight amount of smoke near where
Deputy Duran's muzzle was located became visible in the frame. This was
likely the first shot. Mr. Forston still had his firearm in his right hand.

0:03.564 – Mr. Fortson began falling back towards his right side while his left hand
moved towards his right shoulder area.

0:03.696 – Deputy Duran discharged his firearm. A slight amount of smoke near where
Deputy Duran's muzzle was located became visible in the frame. This was
likely the second shot. Mr. Forston continued to fall backwards toward his
right side while he clutched his upper right chest with his left hand. Mr.
Forston still had his firearm in his right hand.

0:03.960 – Deputy Duran discharged his firearm. A slight amount of smoke near where
Deputy Duran's muzzle was located became visible in the frame. This was
likely the third shot. Mr. Forston continued to fall backwards toward his right
side while he clutched his upper right chest with his left hand. Mr. Forston
still had his firearm in his right hand.

0:04.191 – Deputy Duran discharged his firearm. A slight amount of smoke near where
Deputy Duran's muzzle was located became visible in the frame. This was
likely the fourth shot. Mr. Forston continued to fall backwards toward his
right side while he clutched his upper right chest with his left hand. Mr.
Forston still had his firearm in his right hand.

0:04.290 – Mr. Fortson's right hand struck the ground as he was falling.

0:04.323 – Mr. Fortson's right hip area struck the ground as he was falling. His right
hand was opening.

0:04.4   – Deputy Duran discharged his firearm. There were five shots heard on the
BWC video, but only four could be tracked by looking for frames where slight
smoke appeared. Using just sound, this is the estimated time for the fifth shot
heard on the BWC video.

0:04.422 – Mr. Fortson's right hand was obscured from the camera view by his left thigh.
Mr. Fortson had fallen onto his right side with his feet closest to the door.

0:05.214 – Deputy Duran began removing his left hand from his firearm.

0:05.6   – A sound indicated Deputy Duran's left hand struck something on his own
chest.

0:05.742 – Mr. Fortson's right hand was visible through/between his legs on the BWC video. His firearm was no longer in his right hand. The firearm was not visible on the BWC video.

0:06.4 – Deputy Duran said, "Drop the gun. Drop the gun."

0:08.4 – Mr. Fortson said, "It's over there."

0:09.1 – Deputy Duran said, "Drop the gun."

0:10.0 – Mr. Fortson said, "I don't have it."

For the remainder of Deputy Duran's BWC video review, the time displayed on the video will be used.

16:32:12 – Deputy Duran called over the radio, "312, shots fired. Suspect down."

16:32:16 – Deputy Duran told Mr. Fortson, "Do not move."

16:32:20 – Deputy Duran called over the radio, "312, get EMS [Emergency Medical Services] to my location."

16:32:24 – Other deputies began arriving on scene.

16:32:32 – Mr. Fortson said, "I can't breathe."

16:32:37 – Deputy Duran told Mr. Fortson, "Do not move. Stop moving. Stop moving."

16:32:44 – Mr. Fortson rolled from his right side onto his back. Blood was visible on the floor. Deputy Duran called over the radio, "312, have EMS step it up. He's bleeding profusely. Multiple gunshot wounds to the chest. Black male."

16:32:50 – Deputy Duran told Mr. Fortson, "Hang on man. We got EMS coming for you. Don't move."

16:32:53 – Deputies approached Deputy Duran at the door.

16:32:58 – Deputy Duran told the other deputies, "He had a gun as soon as he opened that door."

The following descriptions utilized Deputy Duran's, Deputy Jacob Runge's (Exhibit 7), and Deputy Christopher Dugre's (Exhibit 8) BWC videos; however, the times are all based on the time on Deputy Duran's BWC video.

16:33:05 – Deputy Duran, Deputy Ezekiel Dixon, Deputy Runge, and Deputy Dugre entered apartment 1401 to clear it to ensure no one else, whether it be a victim, suspect, or other party, is present. This was accomplished by announcing multiple times, "Sheriff's Office, anybody else make your presences known," "Sheriff's Office, make your presences known," "Sheriff's Office," "Sheriff's Office, open the door," as the deputies walked through the apartment ensuring no one else was in the apartment that either needed help, or posed a threat.

16:33:35 – Deputy Dixon transitioned from clearing the apartment to rendering aid to Mr. Fortson.

16:33:44 – The deputies had cleared the apartment. Deputy Runge transitioned from clearing the apartment to rendering aid to Mr. Fortson.

16:33:49 – Deputy Duran said, "I'm going to step out." as he headed to exit the apartment.

16:33:51 – Deputy Dugre transitioned from clearing the apartment to rendering aid to Mr. Fortson.

16:34:05 – Deputy Duran said, "Mother fuck."

16:34:13 – Deputy Duran started walking north in the breezeway away from apartment 1401.

16:34:18 – While he was walking in the breezeway, Deputy Duran struck a wall with his right fist and said, "Fuck."

16:34:27 – Deputy Duran, who had turned around and was walking south in the breezeway, was approached by Corporal Casey Duh. Corporal Duh asked, "You alright?" Deputy Duran answered, "Yeah. As soon as he opened the door, there's a gun."

On 5/17/2024, I conducted a sworn interview with ███████████ in my office located in OCSO Headquarters. The interview was recorded on my BWC (Exhibit 9). The pertinent information is as follows:

- ████████ had been an Airman in the United States Air Force for nearly a year at the time of the incident on May 3, 2024.

- ████████ had lived in her apartment, ██████████████ Mr. Fortson in 1401 since November 2023.

- ████████ did not know Mr. Fortson; however, she knew he was also an Airman. She described seeing Mr. Fortson on her Ring camera in an Air Force uniform. ████████ said, "That was before my subscription ended, but he was on the phone, and he was like, 'Oh, I almost walked into the wrong apartment.' So, when I seen that, I was like, whoa, who's coming to the door?" █████████ did not have that Ring video.

- ████████ had never spoken with nor met Mr. Fortson.

- ████████ said she believed Mr. Fortson was in a relationship because she had heard a female voice coming from his apartment. Mr. Fortson and the female she had heard in the past had been very loud at times.

- ████ said, "Before it was just, usually banter back and forth. You know? Be like, I hit ████████ a couple times, like, hey, be quiet, but never went ████ Nothing was ever to the same extent as it was on the third [May 3, 2024]. That's why I called, because it was concerning, because I was like, it's never been like this and I've been here for six months. You know what I mean? So, that's why it was kind of, concerning for me."

- I commented she had told the leasing agent she thought Mr. Fortson was arguing with someone else ████ ████ acknowledged that. I asked her why she thought Mr. Fortson was in an argument. ████ answered, "They were really loud. I could hear him."

- I asked if she could hear what they were saying. She said, "I couldn't hear like anyone back, but I just assumed, because he was so loud."

- ████ described being able to hear sounds coming from the apartment ████ her, 1401, through an air conditioning vent in her bedroom. She explained, "If you stand right there [near the vent], you can hear everything, and I just so happened to be on my bed, um, while that was going on, so I could hear."

- ████ said she did not hear the voice of who Mr. Fortson was speaking to on May 3, 2024; however, she had heard a female voice in the apartment before.

- ████ said she had heard scuffling during the argument. I asked her to describe the scuffling. She said, "It was really like, you know, you can hear footsteps. They were really, really loud and it was like, it would be constant, and it would stop for a little bit. And then you'll hear talking, scuffling, it's just kind of like, ████ rubbed her feet on the floor of my office loudly]. Kind of like that, and you, like, you can hear it, it's like clear as day through that vent. So, I was like, okay, something's going on. Somebody's moving something, or I don't know if they're bumping into each other, just passing, or something like that. It was like, something is going on, but since he was yelling, I was like, okay, something is wrong."

- I asked ████ if she could make out anything Mr. Fortson said. She answered, "Yes. A couple things. It was two things that really kind of stuck out in particular. He was saying like, um, 'Sick of you lying to my face,' um, 'You're a fucking liar.' This, that, and the third. And that was the, the thing that I was kind of like, okay, they're fighting. That's what, those were indicators that they were fighting to me."

- ████ said because of the language used by Mr. Fortson, and his tone, she believed he was fighting/in an argument with someone.

- ████ said she had been listening to what she had described for approximately thirty minutes before she called the leasing office.

- I asked ████ if she thought she was listening to a physical disturbance ████, and she said yes.

- I asked her if she thought it was weird she had not heard the other person's voice, and she explained, "I didn't really think about it like that. … I'm thinking maybe he's yelling at her, like maybe, sometimes when you're getting yelled at, you just kind of like, uh, I'm in trouble. Like, the nature of the conversation. So, I was just kind of like, okay, maybe she's not yelling back. But I never said, I was like, okay, I hear one person, but I don't hear a second. I didn't break it down like that. All I knew was just for sure that he was."

- ████ said she believed there were two people in the apartment.

- On the day of the incident, Investigator Tyler Colonna obtained a written statement from ████ (Exhibit 10). Investigator Colonna recorded his interview of ████ on his BWC (Exhibit 11).

- When Investigator Colonna was interviewing ████, ████ had expressed she was concerned about the wellbeing of the child she believed to be ████ I asked ████ if she had heard a child ████ before. She said yes.

- I asked ████ what made her believe there had been a child ████ She answered, "You can hear the, the laughing, and the, the little baby footsteps." I clarified that she was sure a child had been in the apartment at times over the last six months, and that she was not mistaking the dog for a child. ████ said, "For sure." I again asked if that could have been the dog she heard, and she shook her head no.

- ████ said she had never seen Mr. Fortson's dog. She acknowledged the footsteps may have been from a dog, but she added, "But you can hear, because like mommy, that hear her crying sometimes. Mommy this, mommy that." I clarified, she had heard a child at times in the apartment, and she answered in the affirmative.

- I asked ████ if she was sure the argument she had heard was from ████ her. She replied, "Yeah, for sure, hundred and twenty thousand percent."

- ████████ said she heard the gun shots, and called 911 (Exhibit 12). ████████ did not hear Deputy Duran when he announced his presence at the door of 1401. During her 911 call, ████████ asked if the child was okay. She was told by the operator that deputies were already on scene, and that she (operator) could not discuss what had happened.

On 5/21/2024, I conducted a sworn interview with ████████████ in my office located in OCSO Headquarters. Mr. Martin McDonnell was present as ████████████ attorney. The interview was recorded on my BWC (Exhibit 13). The pertinent information is as follows:

- ████████ had been a leasing consultant for the apartment complex where the incident occurred for a year and three months.

- ████████████ received the call from ██████ about the disturbance in Mr. Fortson's apartment. ████████ said ██████ had said the disturbance sounded like it was getting handsy.

- ████████ asked ████████████ if there was anything she ██████ could do. Ms. ████████ said, "I explained to her that there was nothing that I could do. I can't go knock on the resident door and tell them, hey, what's going on? So, I told her, you can, if you feel comfortable, you can call the police, or if not, I, I can call the police. So, she hesitated, and I decided to call the non-emergency number."

- I asked ████████████ why she called law enforcement. She replied, "So, my thought process was, I don't want her to not call the police and something actually going on ██████ So, because she hesitated, … So, I stepped outside, and that's when I called the non-emergency line because I was like, I don't want her not to call the police, and me thinking that she did call the police, and something happening. So, that's when I decided to call the non-emergency line."

- ████████████ made contact with Deputy Duran when he arrived on scene.

- I asked ████████████ about the incident which occurred weeks before May 3, 2024, that she had described to both OCSO Communications and to Deputy Duran. I asked where she was located when she heard the yelling and the slapping noise. She said she was on the sidewalk on the ground level. She was not on the fourth-floor breezeway.

- I asked her if she could tell where the yelling and the noise had come from prior to the current incident, and she said no. ████████████ clarified that when she told the deputy she was not sure where the yelling came from, she was referring to the incident which had occurred weeks prior to his arrival to deal with the incident on May 3, 2024.

- I asked ██████████ if she told communications and Deputy Duran the incident was occurring in 1401, and she responded in the affirmative. I asked ████████ if she was sure ████████ said the disturbance was from 1401. ████████ said yes.

- ████████ said she could not confirm the incident she had heard weeks prior came from Mr. Fortson or apartment 1401. She said the prior incident occurred near 1401 and sounded similar to what ████████ had just reported, so she ████████ thought they may be related.

- ████████ said she had dealt with Mr. Fortson around eight times in a work capacity. She gave Mr. Forston a tour of the complex and helped him complete his paperwork when he completed his lease. She had also helped with packages and typical office activities.

- On the day of the incident, Investigator Tyler Colonna obtained a written statement from ████████ (Exhibit 14). Investigator Colonna recorded his interview of ██ ████████ on his BWC (Exhibit 15)

On 5/22/2024, I conducted a sworn interview with Deputy Eddie Duran in my office located in OCSO Headquarters. Mr. John Whitaker was present as Deputy Duran's representative. The interview was recorded on my BWC (Exhibit 16). The pertinent information is as follows:

- Deputy Duran has a bachelor's degree in criminal psychology, and is roughly halfway through a human service counseling master's degree with a focus on crisis response and trauma.

- Deputy Duran served in the United States Army from 2003 through 2014, with a combat deployment to Iraq in 2008. Deputy Duran started his military career in military intelligence then in 2007 moved into military law enforcement. While a military police officer, Deputy Duran received additional training through the Army's Special Reaction Team. He received an honorable discharge.

- After serving in the United States Army, Deputy Duran started his civilian law enforcement career in Oklahoma, where he worked as a police officer and K9 officer from 2015 through 2019.

  - For a period in 2016 through early 2017, Deputy Duran was a fire marshal for the Altus Fire Department.

- During 2019, before moving to Florida and beginning his career at the Okaloosa County Sheriff's Office, Deputy Duran accepted a position as a sergeant for the civilian law enforcement police department on Altus Air Force Base.

- Deputy Duran first began his career at OCSO in 2019. He left in 2021 to follow his spouse, who had a career opportunity outside of Florida. His spouse's career returned them to Florida, where in 2023, Deputy Duran rejoined the OCSO.

  - When Deputy Duran first returned to Florida, he accepted a position with the Department of Children and Families (DCF). The schedule facilitated his completion of his undergraduate degree. Deputy Duran left DCF in good standing, and returned to OCSO.

- On May 3, 2024, Deputy Duran was dispatched to a disturbance in progress call. The call was dispatched to him both over the radio and through his MCT.

  - While enroute to the call, Deputy Duran was updated both over the radio and through his MCT that the disturbance had become physical, and the information was from a fourth-hand person.

- Deputy Duran had responded to calls in the apartment complex in the past, but not to apartment 1401. He had had no prior contact with any of the involved parties.

- Deputy Duran parked his marked patrol vehicle in front of the leasing office in the apartment complex as he was attempting to make contact with the leasing agent who had called the Sheriff's Office reporting the disturbance.

- Deputy Duran then made contact with two men who were in the leasing office. One of the men directed him outside towards where the caller/leasing agent was.

- Deputy Duran made contact with ████████████, the leasing agent and caller, in the parking lot. Deputy Duran did not know who had called the leasing office, and he did not make contact with ████████, the ████████ neighbor who called the leasing office to report the disturbance.

- Deputy Duran said ████████████ had relayed the story of the disturbance she had heard weeks prior to the May 3, 2024, disturbance.

- Deputy Duran asked ████████████ where the current disturbance was located, and ███ ████████ told him 1401 twice. In addition, Deputy Duran saw the apartment number was 1401 on his MCT while responding to the disturbance.

- I asked Deputy Duran what he was thinking when he entered the elevator to go to apartment 1401. He shared, "I'm going into a call that had escalated from verbal to physical. Um, and that it had become increasingly violent and one of the parties had become increasingly violent over a period of time."

- Deputy Duran exited the elevator on the fourth floor and followed the sign pointing towards apartment 1401. Then he called Corporal Duh over the radio to let him know the leasing agent was waiting on the ground level to direct him up to the apartment.

- I asked Deputy Duran why he chose not to wait for a second deputy. He answered, "So, when I was gathering all the information, and from what I was being told and what I knew at that specific time, it had begun as a verbal altercation, which then had escalated into a physical altercation. And so, my thought process was if I don't intervene, I didn't want the, you know, event to escalate into something that could be even, you know, more of a violent crime."

  - I asked Deputy Duran if he had received training that taught direct to threat principles. He said he had. I asked him to explain direct to threat as he understood it. He explained, "Direct to threat to me entails when we are aware of violent crime taking place, uh, that it is our responsibility to go forth, go forward without, you know, um, hesitation and, and making, ensuring that the threat is either eliminated or, um, you know, stopped."

  - I asked Deputy Duran if he understood why law enforcement teaches direct to threat instead of waiting for more law enforcement officers. He answered, "Uh, hesitation can lead to more violent offenses. Uh, and the whole purpose is to stop the violent offenses."

- I asked Deputy Duran what he was thinking while he was walking down the breezeway towards apartment 1401. He said, "So, initially as I'm walking down the hallway, uh, as I deal with a lot of calls for and law enforcement calls, is I immediately start looking for avenues of approach. I look for, uh, areas for, you know, effective cover. Um, and I kind of take in the environment as far as if something were to take place, something violent or some emergency situation, um, what are my avenues of escape."

  - Deputy Duran described the exterior hallway/breezeway as being on the fourth floor with a wall on one side and a railing on the other side. Near the end of the breezeway was a stairwell on the side opposite the wall of the apartments and a short railing at the end of the breezeway.

- I asked Deputy Duran if he heard signs of a disturbance as he was walking down the breezeway. He answered, "No, sir."

- When Deputy Duran arrived at the door to 1401, he listens, starts to knock, then stops and listens again. I asked him if he heard anything during that time. He said, "Uh, just to verify I wasn't hearing anything, or did hear anything, I wanted to ensure, um, that if there was a disturbance or scuffle going on, I could positively identify it." Deputy Duran said he had not heard anything from the apartment at that time.

- I asked Deputy Duran to describe his thoughts at the time on his position on the breezeway in relation to the position of the door to 1401. Deputy Duran described, "Uh, so initially when I am standing in the corner, uh, it was taking a optimal positioning on the doorframe, uh, kind of out of the view of the door. Not, not out of the view of the door, however, just, um, a again, a protected covering using the doorframe as a form of cover. Um, to prevent, you know, should there be any sort of gunshot, uh, violence or coming through the doorframe, it wouldn't hit me directly. Um, so as I'm standing in the corner, I realize right behind me after I knock is the short railing. And then of course right next to me is the wall. Um, and so what I do is I, I, I made the decision, well, I'm not exactly in a great position, should the person come out and choose to come at me physically. Um, so I moved to the opposite side of the door."

- I asked Deputy Duran why he chose to move to the other side of the door after his first knock. He explained, "So, once I had backed into the railing, and as I'm looking around, … So, as I'm looking, I feel the railing behind me. Of course, I know there's a drop. I look to my right and there is a wall for, you know, preventing me to go anywhere. Um, so, then I think to myself, okay, well if he comes out and if by chance there is something that takes place, I don't want to go over the railing. So, I move back to the other side of the wall, the opposite side. And again, I sit, and I wait, and I listen some."

- I asked Deputy Duran why he chose to not stand in front of the door. He replied, "I've been trained to be cognizant of where the doorway is. Um, should, you know, an assailant, whomever it is, decides they want to shoot through the door, um, you know, of course the door's not gonna stop a bullet coming through. Um, and there is a possibility of danger standing in that doorway. So, I've been trying to move off to the sides."

- I asked Deputy Duran why he did not announce himself when he knocked on the door the first time. He said, "Initially, uh, what I'll do is I'll knock on the door, um, kind of hear for, listen for a response. Um, generally if it's a, who's there, who is it, uh, what do you want? You know, get away from the doors, any, whatever the response is. So, I'll knock, um, in a, I guess you could say normal, typical knock, um, to see what the response is gonna be. And I kind of will gauge it, you know, um, is the person sounding aggressive?

Is the person sounding okay, calm, or you know, is it just a who is it or is it like a more aggressive, you know."

- I asked Deputy Duran if he ever heard anything from inside the apartment before the door opened, and he said yes and explained, "I can hear somewhat of a muffled, uh, voice."

  - I replayed Deputy Duran's BWC video after the first knock and before the second knock. I asked him, "Could you clearly hear what that was?" He said, "The only thing that I could hear was something to the effect of referencing police. Uh, that was about the extent of it."

  - I clarified, "Okay. So, you think you hear the word police." He corrected me, "Something to the effect of police."

  - I asked him if he understood the rest of the sentence, and said, "I can't make out the rest of the sentence. No, sir."

  - I continued questioning what he heard. He added, "So, when I'm standing here listening, uh, again, I hear a muffled voice. So, then again, something to the effect of the police, whether there was a expletive word in the beforehand, you know, but I did recognize the word police, which then led me to believe he understood that I was at the door."

    - I asked Deputy Duran what he thought he heard. He replied, "Something to the effect of, it's the fucking police."

    - I asked Deputy Duran what he was thinking at that point. He said, "At that point, uh, I reason to believe he understands that I'm at the door, that the police are at the door. Um, and then of course I continued to hear him talking, which is why you see me move forward and then I knock on the door and announce sheriff's office."

- Deputy Duran then knocked on the door the second time and he announced his presence. Deputy Duran did not hear anything from inside the apartment.

- I asked Deputy Duran why he stayed to the left of the apartment door after the third time he knocked and second time he announced himself. He answered, "So, as I'm on the right side of the hallway of the door, um, and I hear 'fucking police,' that tells me he understands that I'm there. There are still no, you know, um, compliance as far as opening the door. Um, so as I knock and then I announce myself, it's, it's very clear and apparent, Sheriff's office opened the door, um, I start gathering kind of information

thinking, okay, well he knows who I am. He's already said it. … So, as I'm on the door, uh, I think to myself, okay, so if I'm knocking on the door, he's not answering the door. He's not, he's already acknowledged my presence. That tells me he's either hesitating for whatever reason, or there is, you know, he's gonna open the door, and, you know, obviously if I'm there for a disturbance in progress that I was told was physical, which tells me one of the parties was violent. Um, so I am making the decision to go, okay, well if I'm in on that side of the hallway [right of the door as facing the door], I have nowhere to go. Should something go south, um, I can't run down the hallway because clearly you can see there's nowhere for me to go. I can't go over the railing. Um, I can't run down the stairs. It'd be more dangerous for me to run down the stairs. I can't hide behind a wall. So, my only initial thought was, okay, well it's not optimal; however, standing on the door side [left of the door as facing the door] is going to be better for me, beneficial for me to stay out of harm's way, um, despite being stuck in the corner."

- I asked Deputy Duran what he said to Mr. Fortson when the door opened. He answered, "Step back."

    o I asked him why he said step back, and he explained, "So, as soon as the door opens, I see the individual open the door, and as he's moving in. I tell him step back. And then, um, you know, as he's opening the door, he's, he's starting to move forward."

    o I asked Deputy Duran what Mr. Fortson did in response to his command to step back, and Deputy Duran said, "He makes a slight step forward with his left leg."

    o I asked if Mr. Fortson was complying with him (Duran). He answered, "No, sir."

- I asked Deputy Duran when he saw Mr. Fortson's firearm. He answered, "It was step back, gun." Deputy Duran elaborated, "As soon as the door initially opens, uh, I see him moving forward. I tell him step back, but as I'm telling him, step back, I'm looking at his eyes, and then I immediately look at his hands, uh, which is what I've been trained to do. Look at the eyes, tells me a lot about a person's intent, and look at the hands, obviously tells me if they're empty, open handed, balled up, you know, have a gun, weapon, knife, whatever it is. Um, so as I am taking all of it in, I see him step forward. I see his eyes, I look down, I see his hands, and of course that's when I see the gun."

- I asked Deputy Duran about his impression when he looked at Mr. Fortson. He said, "When I saw his eyes, uh, I saw aggression. I saw, you know, um, obviously again, interacting with individuals in these types of situations, you are dealing with people who are most likely and during the worst time of their life at that particular moment. Um, so I see aggression, anger, um."

- o I asked him to explain what made him believe he saw aggression. He explained, "When I looked at him and he made eye contact or I made eye contact with him, it was a stare that was fixated 100% on me. Um, which as I'm looking at him, it wasn't eyebrows raised, hey, what's going on, inquisitive, why are you here? It was a stare. Not so much a, like I said, inquisitive look. Um, so that showed me, there was aggression. That showed me that there was obviously is a little bit of discontent for me knocking on the door."

- I asked Deputy Duran what he thought when he saw Mr. Fortson's firearm. He said, "So, initially when I see the firearm, uh, the elbow, his hand and the elbow are slightly canted, meaning not straight down. It is in a manner so that his arm is slightly up. Um, so when I see the gun, I immediately see the grip that he has on it, which is standard pistol grip. Um, I see the back part of the sites, which of course dovetail sites have on specific guns, have a white u-shaped line on the back of the gun. … Glock … So, then I see that, and then I see immediately there is a red or optic, like a red dot, kind of how we have on our guns mounted to the top side of the gun."

- I asked Deputy Duran what he did next. He answered, "So then immediately at, at that point, once I've gauged, um, from what I can understand his intent, um, what I can understand as far as him knowing that I was already there, um, from what I know that I'm telling him to step back and there was a slight step forward. Uh, immediately I thought, I am stuck in this area and I'm about to get shot."

  - o I asked Deputy Duran if he considered moving off-line (out of the way). Deputy Duran again explained the limitations presented by his positioning on the breezeway, which in his mind made moving impractical.

  - o I asked Deputy Duran if he considered telling Mr. Fortson to drop the gun or issue other commands. He answered, "Uh, based on everything that I had taken into account, I felt 100% that action was gonna be my best course as opposed to reaction. Uh, based on how close we were, uh, the proximity, obviously there was maybe three to four feet of a reactionary gap, whereas a typical reactionary gap's gonna be between six to eight. Um, I immediately felt that I was at a disadvantage considering he had his gun readily available for use. Um, and mine was still holstered. So, at that point, uh, again, action was gonna be better for, than reaction to prevent any kind of, uh, great bodily harm or or death to myself."

- I asked Deputy Duran if he encountered resistance from Mr. Fortson. His initial answer was no. Deputy Duran then clarified, "I'm sorry, sir. Can you clarify resistance? [I was not given time to clarify, Deputy Duran continued] Uh, because as far as giving him a

command, to step back.  Him moving forward would be considered resistance.  Now if you're referencing like a physical resistance, then no."

- o I clarified any kind of resistance, and Deputy Duran continued, "So, yes then, it would just be him moving forward."

- o I asked if there was any resistance other than Mr. Fortson taking a slight step forward after being commanded to step back, and Deputy Duran said no.

- I asked Deputy Duran how many times he thought he shot.  He said, "About five times."

- I asked him if he remembered bringing his left hand towards his chest right after he stopped firing, and he said he was reaching for his radio to call shots fired, but Mr. Fortson was still moving, so he went back to a two-hand position.

- I asked Deputy Duran why he gave commands to Mr. Fortson to drop the gun once Mr. Fortson was lying on the ground.  Deputy Duran said he could not see Mr. Fortson's hands, nor could he see the gun.

- Mr. Forston had told Deputy Duran, "It's [the gun] over there."  Deputy Duran told Mr. Forston a third time to drop the gun.  I asked Deputy Duran why he said it a third time, and he explained, "He responded, but I couldn't hear anything.  It was just, I, I really couldn't understand it.  Which is why I gave him the second, the third command and dropped the gun.  So, then he said, um, I don't have it, or it's over there.  One of those two?  Um, and then at that point I did see his hands, so I knew that there was no longer a gun."

- Roughly sixteen seconds after the first shot, Deputy Duran called for EMS.  I asked him what he was thinking then.  He said, "Right at that point I'm thinking, I don't know what else is in the home.  I don't know if there is any other threats in the home.  So, I'm standing in that position, um, and I'm trying to process what took place at that time."

- Other deputies started arriving on scene.  Roughly twenty-four seconds after the first radio call for EMS, Deputy Duran called again and asked that EMS step it up.  I asked Deputy Duran why he made the second call. He answered, "At that point, Mr. Fortson, he was initially on his right side, I believe.  Um, and then he had rolled onto his back, and when he rolled onto his back, I could see blood's beginning to pool on the ground, which told me that there was most likely, um, exit wounds, uh, going through.  And so, again, I know when I shot, it was they were around his torso.  Um, and so seeing the pool of blood, knowing how many times I shot, I immediately thought, okay, if we don't give him medical attention, you know, he's not gonna make it.  And so, I wanted to really convey

they need to get here fast because I, I can't go in the home at this particular moment, uh, to help render aid. … Despite whatever was going on, I, I still would like to render aid, and make sure he's gonna be okay. So, um, I tell them, step it up. You know, they, in my eyes, they need to get here as fast as possible."

- Deputy Duran explained that when other deputies got to him, they cleared the apartment looking for other people which may have been inside. I asked him why they cleared the residence before rendering aid. Deputy Duran said, "If we get into a position where we're rendering aid, and if there is somebody else in the home, be it, you know, another individual, I don't, didn't know how many people were in the house. Again, don't know how many weapons are in the house. Uh, if the other alleged party that's in the home, you know, is gonna come after us for shooting Mr. Fortson. Um, so I've always been taught that it's better to secure the area. Clear the area, then begin to immediately render aid."

- As Deputy Duran finished clearing the apartment, other deputies began rendering aid. Deputy Duran then exited the apartment. I asked him why he exited, and he said, "Since there was already, the deputies that were starting to begin, beginning to render aid, I knew that I had to remove myself for that and then wait for my supervisor to show up."

- I asked Deputy Duran why once outside the apartment, he exclaimed "fuck" and struck the wall. Deputy Duran explained, "Because that was something that I had hoped that would never happen, and it was as far as, the shooting, uh, and everything. It was, um, just kind of letting out whatever, you know, built up emotion and frustration and, um, just letting it out because it was just one of these things where, you know, as I'm standing there thinking I'm about to get shot, I'm about to die. And so once it all, once said and done, it was just all the emotion going, oh my God. Like, just let it out, you know? And then of course trying to keep it together and, and, um, I mean that was, that was just letting out whatever emotions and fear and frustrations come out."

- Deputy Duran continued, "It was immediate. Um, again, for me it was, you know, go in the home clear, make sure we're good, make sure he's getting aid, and then, essentially business first, personal me afterward. And so, it was, um, just replaying what took place and it was, you almost didn't go home today. And so, it was just one of those, I got to get that out really quick, you know? So, yeah."

- Mr. John Whitaker, Deputy Duran's attorney and representative asked Deputy Duran if he had an overwhelming thought, taking everything into account, when he decided to use deadly force. Deputy Duran said, "It was, I mean, in all honesty, it was, he's got me. I mean, it is, it is him or me at this point, and I need to, I need to act as opposed to react."

- After Deputy Duran's response, I readdressed the position of Mr. Fortson's firearm. Deputy Duran described, "[The firearm was] slightly canted. So, as if we're standing, um, you know, not, not here by any means [Deputy Duran demonstrated a hand position which would have shown the gun pointing at him], it was kind of in a defensive, you know, looking at what's going on, possibly offensive, I don't really know, but I could see the bend and the hand was here [Deputy Duran demonstrated a hand position which showed the gun was not pointing at him]. I don't know, you know? You know, and again, in the video, when I step in the whole deal, then you can see it down, but at that point we're already engaged."

On 5/29/2024, I conducted a sworn interview with ████████████ via Zoom. Ms. Lashonda Council-Rogers was present as ████████ attorney. The interview was recorded (Exhibit 17). ████████ called my office after the Zoom meeting had ended to add to her interview. The phone call was recorded on my BWC (Exhibit 18). The pertinent information is as follows:

- ████████ identity was verified through her Alabama Driver License.

- ████████ was on a FaceTime call with Mr. Fortson during the time leading up to and through the physical disturbance call received by OCSO.

- ████████ denied she and Mr. Fortson had been engaged in an argument. I asked her about two specific statements the witness said she heard Mr. Fortson make, and she denied hearing Mr. Fortson say those statements, or anything similar.

- ████████ said Mr. Fortson was in his living room playing a video game when the first knock occurred. She described what happened after the first knock at the door by Deputy Duran, "He then hears the knock at the door, and when he hears the knock at the door, he asks, 'Who is it'? And he didn't get a response. And he told me, I don't know who that could be because nobody comes up to my house." ████████ and Mr. Fortson discussed neither of them knew who could have been knocking on his door. He told her he was not going to answer the door.

- I asked ████████ if after the first knock, after Mr. Fortson asked who is it, and before the second knock, if Mr. Fortson said anything similar to the words "fuck" and/or "police." She answered no.

- She said after the second knock, Mr. Fortson went to the front door to look through the peephole, and he said he did not see anyone. He then returned to the living room.

- I asked ███████ if either she or Mr. Fortson heard, "Sheriff's Office, open the door." She said neither of them heard that.

- Mr. Fortson was in the living room when the third knock occurred. I asked ███████ if either she or Mr. Fortson heard, "Sheriff's Office, open the door" after the third knock, and she answered, "No, but the knock gets aggressive. … It's louder like they're banging on the door at this point."

- ███████ explained Mr. Fortson's actions after the third knock, "Then he puts the phone down and says, I'm gonna go grab my gun, because I don't know who that is." ██ ██████ said he kept his firearm in his bedroom.

- I asked ███████ if she saw Mr. Fortson with his firearm, and she said no.

- I asked ███████ if she had initially thought the sounds of gunshots were instead the sounds of law enforcement busting through Mr. Fortson's door. She answered yes. I asked if she had told people law enforcement had busted through Mr. Fortson's door. She answered yes. I asked her if she later learned/realized law enforcement had not busted through Mr. Forston's door, and she said correct.

- Shortly after the Zoom interview ended, ███████ called my office to add information to her interview. She said, "So the third knock, whenever the knock was aggressive, um, he [Fortson] did say who the F is it really loud. … He said that really loud, um, before he opens the door."

    o I clarified that that was said before the third knock, and not the second knock, and she said, "Not before the second knock. No, this is at like, the very, very end before he opens the door."

███████ interviews, the Zoom interview and the subsequent phone interview, were after Deputy Duran's interview, and were therefore unavailable prior to his (Duran) interview. I provided Deputy Duran and Mr. Whitaker the interviews and asked if they had anything they wished to add. Mr. Whitaker responded by email (Exhibit 19) and said they had reviewed the interviews, and did not wish to provide an additional statement.

**Interviews:**

1. 

2. 

3. Deputy Eddie Duran
   50 2nd Street
   Shalimar, FL 32579

4. 

**Exhibits:**

1. Offense Report OCSO24OFF005964
2. Computer Aided Dispatch Report OCSO24CAD083600
3. Apartment recording of ⬛⬛⬛ phone call to report the disturbance
4. OCSO recording of ⬛⬛⬛ phone call to report the disturbance
5. OCSO recording of the radio traffic related to the disturbance call
6. Deputy Eddie Duran's BWC video
7. Deputy Jacob Runge's BWC video
8. Deputy Christopher Dugre's BWC video
9. Captain Robert Wagner's BWC video of his interview of ⬛⬛⬛
10. ⬛⬛⬛ written statement
11. Investigator Tyler Colonna's BWC video of his interview with ⬛⬛⬛
12. ⬛⬛⬛ 911 call
13. Captain Robert Wagner's BWC video of his interview of ⬛⬛⬛
14. ⬛⬛⬛ written statement
15. Investigator Tyler Colonna's BWC video of his interview with ⬛⬛⬛
16. Captain Robert Wagner's BWC video of his interview of Deputy Eddie Duran
17. Captain Robert Wagner's recorded Zoom interview of ⬛⬛⬛
18. Captain Robert Wagner's BWC video of his phone interview of ⬛⬛⬛ post Zoom interview
19. Email from Mr. John Whitaker declining to add a statement after ⬛⬛⬛ interviews

**Discussion:**

Florida State Statute 776.05, Law Enforcement officers; use of force in making an arrest, specifies an officer is justified in using any force he/she reasonably believes is necessary to defend himself/herself or another from bodily harm. The statute is also codified in OCSO General Order 04.01 - Response to Resistance. Additionally, General Order 04.01 - Response to

Resistance states OCSO Deputies are authorized to use only that amount of force that is objectively reasonable to perform their duties.

Objective reasonableness is the standard the United States Supreme Court established in *Graham v. Conner*, 490 U.S. 386 (1989) as the metric used when determining if a law enforcement officer's use of force was reasonable. Objective reasonableness is defined as evaluating each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to themselves and the community when determining the necessity for force and the appropriate level of force. A deputy's use of force will be evaluated by asking were the deputy's actions objectively reasonable in light of the facts and circumstances confronting him or her, without regard to his or her underlying intent or motivation.

The reasonableness of a particular use of force will be judged from the perspective of a reasonable law enforcement officer at the scene and allow for the fact that deputies are often forced to make split-second decisions about the amount of force necessary in a particular situation. Deputies will consider alternatives to the use of force which are consistent with deputies' safety and the safety of the community. Deputies maintain the right to self-defense and have a duty to protect the lives of others. A deputy's decision to use force should be based on the level(s) of resistance by the subject versus the control options available to the deputy. Both resistance and control may be verbal or physical actions.

OCSO General Order 04.01 – Response to Resistance provides direction and guidance to OCSO members in reference to use of force. Below are a few relevant excerpts from the policy as published at the time of the incident:

C. Definitions

7. Objective Reasonableness - Is the standard by which a deputy's response to resistance will be evaluated by asking whether the deputy's actions are objectively reasonable in light of the facts and circumstances confronting him or her, without regard to the deputy's underlying intent or motivation. The reasonableness of a particular use of force must be judged from the perspective of a reasonable law enforcement officer at the scene, and allow for the fact that police officers are often forced to make split-second decisions about that amount of force necessary in a particular situation.

E. Discussion

1. Although Florida Statutes give a wide range in the use of force to law enforcement, Okaloosa County Sheriff's Deputies are authorized to use only that amount of force that is objectively reasonable to perform their duties. Objective Reasonableness is the standard by which a deputy's use of force will be evaluated by asking whether the deputy's actions are objectively reasonable in light of the facts and circumstances confronting him or her, without regard to his or her underlying intent or motivation, see *Graham v. Conner*, 490 U.S. 386 (1989).

2. The reasonableness of particular use of force will be judged from the perspective of a reasonable law enforcement officer at the scene, and allow for the fact that deputies are often forced to make split-second decisions about that amount of force necessary in a particular situation.

F. Procedures

    2. Subject Resistance Levels

        d. Deadly force resistance is a subject's hostile, attacking movements with or without a weapon that create a reasonable perception by the officer that the subject intends to cause and has the capability of causing death or great bodily harm to the officer or others.

            I. Some examples of deadly force resistance include the following:

                i. A subject refuses to drop a knife when ordered to by the officer and moves toward the officer.

                ii. A subject shoots or points a gun at an officer or other person.

                iii. A subject tries to run an officer down in a vehicle.

    3. Deputy Response Options

        b. Use of deadly force may be a deputy's first and only appropriate response to a perceived threat. Deadly force does not necessarily mean that someone died from the force used. It can cause great bodily harm or no harm at all. For example, returning fire is deadly force even if the officer misses the target.

            I. The deputy must base his or her decision to use deadly force as a defensive tactic on a clear, reasonable belief that he or she, a fellow officer, or another person, faces imminent danger of death or great bodily harm.

    4. Response to Resistance

        a. Deputies should assess the incident in order to determine the level of control that would be appropriate. When possible, deputies should attempt to gain control by means of verbal directives or commands. It is not always necessary to stand your ground. It may be more prudent to move back and tactically reposition in order to de-escalate a situation.

        b. If verbal directives or commands are ineffective, or not feasible given the circumstances of the situation, the deputy may find it necessary to

escalate to control method(s) that involve the use of physical force. If force is necessary, the deputy must decide which technique(s) or authorized equipment will best de-escalate the incident and bring it under control in a safe manner.

7. Deadly Force

a. Discharging a firearm at another human being is an application of deadly force and must, therefore, be objectively reasonable. Each deputy discharging a firearm must establish independent reasoning for using deadly force.

IV. Deadly force shall only be used when the officer reasonably believes that the action is in defense of human life, including the officer's own life, or in defense of any person in imminent danger of serious physical injury.

OCSO General Order 04.01 – Response to Resistance directly references *Graham v. Conner*, 490 U.S. 386 (1989). Below are quotes directly from *Graham v. Conner*:

This case requires us to decide what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person. We hold that such claims are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard. (*Graham v. Conner*, 1989, p. 388)

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. (*Graham v. Conner*, 1989, p. 396)

The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation. (*Graham v. Conner*, 1989, p. 396 & 397)

**Conclusion:**

Deputy Eddie Duran was dispatched to a physical disturbance in progress. He was dispatched to 319 Racetrack Road Northwest apartment 1401 by means of radio and CAD on his MCT. He was instructed to meet the leasing agent, ▓▓▓▓▓▓▓▓▓▓▓, who had called the OCSO non-emergency line to report the disturbance in apartment 1401 on behalf of the ▓▓▓▓▓ neighbor, ▓▓▓▓▓▓▓▓▓▓ who resided in apartment ▓▓▓▓



Deputy Duran met ████████████ in the parking lot. As they were walking towards the elevator, ████████████ recounted an incident she heard a few weeks prior. She heard a male voice yelling at someone followed by what she perceived as the sound of a slap. ████████████ told Deputy Duran she was not sure where that incident occurred, but it was near apartment 1401, and she thought given the current complaint, it may have been related. Deputy Duran asked for the apartment number of the current call, and twice ████████████ stated 1401.

Deputy Duran knew backup deputies were responding, and he asked ████████████ to wait for them downstairs and direct them to the apartment. Deputy Duran, concerned that physical violence was occurring, did not wait for backup, but rather went to the apartment directly to address the disturbance.

When Deputy Duran approached the door to apartment 1401, he listened for sounds of a disturbance. He did not hear any. He then knocked on the door and chose not to announce his presence. He was listening for a response. After the first knock Deputy Duran said he heard, "Something to the effect of, it's the fucking police." Deputy Duran did not say that with certainty, but rather on multiple occasions during his interview qualified what he heard with the phrase "something to the effect of." Despite not knowing with certainty what he heard, Deputy Duran said he was certain Mr. Fortson knew he (Duran) was law enforcement. As Deputy Duran had not yet announced Sheriff's Office, I asked how Mr. Fortson knew he (Duran) was law enforcement, and Deputy Duran did not know. Mr. Fortson did not have any cameras that could have given him a view of who was outside his door. Roughly eight seconds after the first knock, and before Deputy Duran heard Mr. Fortson, Deputy Duran crossed in front of the door and its peephole. Deputy Duran did not at any time cover the peephole.

Deputy Duran then knocked on the door a second time and announced, "Sheriff's Office, open the door." He knocked on the door a third time and again announced, "Sheriff's Office, open the door." Mr. Fortson opened the door, and Deputy Duran thought Mr. Fortson was moving forward which caused Deputy Duran to command, "Step back." Deputy Duran said Mr. Fortson then took another slight step forward. This was the only resistance Deputy Duran said he encountered from Mr. Fortson. Deputy Duran also described Mr. Fortson as having a discontented, non-inquisitive stare.

Deputy Duran said he saw Mr. Fortson's firearm as he (Duran) finished saying step back. He said Mr. Fortson's elbow was slightly canted. Deputy Duran demonstrated Mr. Fortson's hand/gun position when he (Duran) first saw the firearm. It was a position which had the firearm pointing down with a slight angle forward. He then demonstrated a hip-shooting position which had the firearm pointing forward and he said it was not that. Deputy Duran described seeing the white U shape in the rear sight of the firearm when he first saw the firearm. To see the rear face of the rear sight sufficiently enough to make out the markings, the firearm would have to have a significant downward pointing angle.

Deputy Duran stated he felt he was going to be shot, and that his best course of action was to act first, not react. Deputy Duran drew his agency issued firearm and shot Mr. Fortson multiple times. Roughly sixteen seconds after first shooting, Deputy Duran called for EMS over the radio. Recognizing Mr. Fortson was losing a significant amount of blood, Deputy Duran made a

second call for EMS roughly twenty-four seconds later asking for them to expedite their response.

When back up deputies arrived, they and Deputy Duran quickly cleared the apartment ensuring there was no one else in the apartment that could have been in need of help, or who could have posed a threat. Approximately a minute and a half after shots were fired, deputies began administering aid to Mr. Fortson.

The objective facts presented to Deputy Duran were the following:

- He was dispatched to an in progress physical disturbance in an apartment.
- He received second-hand information from the leasing agent about the current incident, and she relayed an incident from weeks prior that happened in the area of the apartment he was responding to.
- He listened for sounds of a disturbance at the apartment door and did not hear any.
- He knocked without announcing his presence and listened for a response. Four times Deputy Duran qualified what he believed Mr. Fortson said by saying, "Something to the effect of." When describing what he heard, Deputy Duran said, "Something to the effect of, it's the fucking police."
- He knocked two more times, and announced his presence both of those times.
- When the door opened, Deputy Duran said Mr. Fortson was moving towards him. Deputy Duran said, "Step back," and Deputy Duran said he (Fortson) took another slight step forward.
- He described seeing aggression and anger in Mr. Fortson's eyes. Deputy Duran further described Mr. Fortson as having a discontented, non-inquisitive stare.
- Deputy Duran saw Mr. Fortson had a firearm in his hand with his (Fortson) elbow slightly canted. He described the firearm as not pointing at him (Duran). The firearm was pointed at the ground sufficiently enough for Deputy Duran to have clearly seen the rear face of the rear sight.

Okaloosa County Sheriff's Office General Order 04.01 – Response to Resistance section F.2.d. states, "Deadly force resistance is a subject's hostile, attacking movements with or without a weapon that create a reasonable perception by the officer that the subject intends to cause and has the capability of causing death or great bodily harm to the officer or others." The objective facts as discovered in this administrative investigation do not show Mr. Fortson made hostile, attacking movements, and therefore, the objective facts do not support the use of deadly force as an appropriate response to Mr. Fortson's actions. Deputy Eddie Duran's use of deadly force was not objectively reasonable.

**Findings:**

**Deputy Eddie Duran**

1. The facts and evidence show Deputy Eddie Duran's use of deadly force against Mr. Roger Fortson was not objectively reasonable. OCSO **General Order 11.03, Section E, Paragraph 35, Excessive Use of Control to Resistance** is **SUSTAINED**.

*I, the undersigned, do hereby swear, under penalty of perjury that, to the best of my personal knowledge, information, and belief, I have not knowingly or willfully deprived, or allowed another to deprive, the subject of the investigation of any of the rights contained in ss. 112.532 and 112.533, Florida Statutes and declare that I have read the foregoing Internal Investigation Report and that the facts stated in it are true and correct to the best of my knowledge and belief.*

Captain Robert A. Wagner
Office of Professional Standards
Okaloosa County Sheriff's Office