UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**CHANTIMEKKI FORTSON**,
individually and as the Personal
Representative of the Estate of Roger
Fortson,

    **Plaintiff**,

v.                                        Case No. 3:25cv591-TKW-ZCB

**SHERIFF ERIC ADEN**, in his
official capacity, **et al.**,

    **Defendants**.
_____/

## ORDER GRANTING MOTION TO DISMISS

This case is before the Court based on the motion to dismiss filed by Defendant Chez Elan FL Property, LLC (Chez Elan) (Doc. 14). Upon due consideration of the motion, Plaintiff's amended response in opposition (Doc. 22) and its attachment, the complaint (Doc. 1) and its attachments (Docs. 2, 2-1), and Plaintiff's notice of supplemental authority (Doc. 29), the Court finds that the motion is due to be granted.[1]

### Background

This case arises out of a tragic incident in which an active-duty Air Force

---

[1] This disposition renders the other motions filed by Chez Elan (Docs. 24, 28) moot.

member, Roger Fortson, was shot and killed in his own apartment by an Okaloosa County deputy sheriff. The apartment complex where Mr. Fortson lived is owned by Chez Elan, and the deputy was dispatched to the complex to investigate a potential domestic disturbance reported to law enforcement by a Chez Elan employee identified in the complaint as Jane Doe.[2]

The complaint, filed by the personal representative of Mr. Fortson's estate, asserts claims against the deputy, the Okaloosa County Sheriff, Chez Elan, and Ms. Doe. The claims against Chez Elan—negligence (Count 4) and gross negligence (Count 5)—are based on (1) its vicarious liability for the consequences of Ms. Doe calling law enforcement to Mr. Fortson's apartment, and (2) its failure to train or supervise Ms. Doe regarding protocols for calling law enforcement.

Chez Elan responded to the complaint with a motion to dismiss,[3] arguing that the claims against it should be dismissed under Fed. R. Civ. P. 12(b)(6) because landowners have no duty to investigate ongoing crimes before notifying law

---

[2] The complaint alleges that Plaintiff has not been able to identify Ms. Doe because her name is redacted in the police reports and Chez Elan has refused to give Plaintiff her name.

[3] The motion was styled as a "Motion to Dismiss …, or in the Alternative, Motion for More Definite Statement and Motion to Strike." The motion for more definite statement pointed out that the complaint does not identify Mr. Fortson's "statutory survivors," and the motion to strike was directed to the complaint's "extraneous allegations," "improper legal briefing," unsupported or unavailable claims for relief (e.g., joint and several liability, punitive damages, and attorney's fees and costs), and jury-trial demand. The motion also requested an order prohibiting disclosure of Ms. Doe's identity, but it indicated that separate briefing would be submitted on that issue—which it was. *See* Doc. 28.

enforcement; the allegations in the complaint do not overcome the "qualified immunity" under Florida law for citizen reports to law enforcement; Mr. Fortson's death was not proximately caused by Ms. Doe's report to law enforcement; and there can be no negligent training and supervision without underlying negligence. The Court finds the "qualified immunity" argument persuasive (and dispositive of both the vicarious liability and negligent supervision/training claims), so the Court need not address the other issues raised in the motion.[4]

---

[4] That said, for sake of completeness, although Plaintiff is likely correct that she pled enough to withstand a motion to dismiss on the issue of causation despite the deputy's intervening actions, *see Zivojinovich v. Barner*, 525 F.3d 1059, 1069 (11th Cir. 2008) (citing *Townsend v. Westside Dodge, Inc.*, 642 So. 2d 49 (Fla. 1st DCA 1994)), the Court is skeptical that a jury would ultimately find that the deputy's use of deadly force—which happened within seconds of Mr. Fortson opening the door and resulted in the deputy being criminally charged—was conceivable (much less reasonably foreseeable) to Ms. Doe when she called law enforcement or spoke with the deputy when he arrived at the apartment complex. Thus, denial of the motion to dismiss on the issue of causation would likely only serve to delay the inevitable.

The Court did not overlook Plaintiff's argument that it was foreseeable that Mr. Fortson would be harmed in an encounter with law enforcement because he was an armed "young Black man." However, as far as the Court can discern, neither Florida nor any other state has recognized the concept of "racialized foreseeability" on which this argument is based. Indeed, even the case cited by Plaintiff in support of this argument, *Estate of Jones by Jones v. City of Martinsburg*, 961 F.3d 661 (4th Cir. 2020), does not recognize the concept of "racialized foreseeability" or even discuss the issue of foreseeability more generally. The narrow issue in that case was whether officers were entitled to qualified immunity from an excessive force claim when they shot a secured and incapacitated individual who was lying on the ground. *Id.* at 664, 671. The race of the individual was immaterial to the court's legal analysis or holding, and the paragraph at the end of the opinion stating that the death of black men at the hands of the police "has to stop," *id.* at 673, had nothing to do with the court's holding. At best, that paragraph is dicta, and at worst, it is gratuitous political commentary that has no place in a judicial opinion.

Moreover, even if Plaintiff is correct that it is "especially foreseeable that a false report about an armed Black man would escalate into a fatal encounter," it is hard to see how Ms. Doe could have possibly foreseen that Mr. Fortson would have been shot by the deputy simply because it turned out that he was black and armed when he came to his door because the complaint does not allege that Ms. Doe was aware that he might be armed when she called law enforcement or

3

## Facts[5]

On May 3, 2024, Ms. Doe was working in the apartment complex's leasing office when she received a call from a tenant who lived in a neighboring apartment to Mr. Fortson. The tenant reported hearing a domestic disturbance in Mr. Fortson's apartment that had been going on "for like thirty minutes" and "sounds like it's getting a little handsy."

The tenant told Ms. Doe that she didn't know what to do. Ms. Doe told her that she could call the police or that Ms. Doe could do so. The tenant "hesitated," so Ms. Doe decided to call the police because she was concerned about what might happen if the tenant did not call the police and "something [was] actually going on."

Ms. Doe called the "non-emergency line" for the Okaloosa County Sheriff's Office, not 9-1-1, to report the disturbance. She relayed the information that she received from the tenant about the disturbance—i.e., that it had been going on for 15 to 20 minutes; that it was still going on; and that it "sounded like it started getting

---

that she conveyed any information about weapons or Mr. Fortson's race to law enforcement. Thus, Mr. Fortson's race does not appear to have any relevance to the claims against (at least) Chez Elan and Ms. Doe.

[5] The facts set forth below are based on the allegations in the complaint and the information contained in the investigative report attached to the complaint. *See Saville v. Webb*, 2025 WL 2254239, at *5 n.4 (11th Cir. Aug. 7, 2025) ("Exhibits attached to a complaint may be considered on a Rule 12(b)(6) motion, as they are considered part of the complaint.").

4

physical"—and provided Mr. Fortson's apartment number as the location of the disturbance.

Ms. Doe did not embellish the report or suggest that she had first-hand knowledge of what was going on in Mr. Fortson's apartment; she simply reported what she had been told.[6] Ms. Doe also mentioned a verbal dispute that she overheard "[a] few weeks ago" that "might have" come from the same apartment, although she also stated that she "couldn't tell where it was coming from."

Ms. Doe provided the same information to the deputy who was dispatched to investigate the disturbance. She again did not suggest that she had first-hand knowledge of what was going on in Mr. Fortson's apartment and simply relayed what the tenant had told her.[7] And, when she told the deputy about the verbal altercation that she heard "two weeks ago," she told him the same thing that she told the dispatcher—"I wasn't sure where it came from."

Ms. Doe provided the deputy Mr. Fortson's apartment number—the same number that she gave the dispatcher based on the information she received from the

---

[6] This is evident from what Ms. Doe told the dispatcher about the incident. *See* Doc. 2 at 4 ("<u>She said</u> it's been going on for like 15 to 20 minutes, and … when she called me, <u>she said</u> that she was calling me because it sounded like it was starting to get out of hand …. <u>She said</u> that it sounded like it started getting physical.") (emphasis added). It is also evident from what the dispatcher told the deputy about the incident. *Id.* ("It's all <u>fourth party information</u> through the front desk at the leasing office.") (emphasis added).

[7] In response to the deputy's question, "[a]re they fighting or something," Ms. Doe stated, "[t]hat's what the [] <u>neighbor said</u>; that <u>she was saying</u> that it happens frequently, but this time it sounded like it was getting out of hand." Doc. 2 at 5 (emphasis added).

5

tenant who reported the disturbance to her. After that, the deputy went to Mr. Fortson's apartment and Ms. Doe did not have any further involvement in the incident.

The deputy knocked on the door of Mr. Fortson's apartment and announced his presence.[8] Mr. Fortson did not immediately come to the door, and when he did, he was armed with a handgun.[9]

Within three seconds of Mr. Fortson opening the door, the deputy unholstered his service weapon, pointed it at Mr. Fortson, and fired. The deputy fired a total of five shots in a little less than one second. Mr. Fortson was hit in the chest multiple times and died at the scene from his injuries.[10]

---

[8] The complaint alleges that the deputy "did not initially announce his identity as law enforcement" when he knocked on Mr. Fortson's door, Doc. 1 at ¶28 (emphasis added), but that is misleading because the investigative report attached to the complaint reflects that even though the deputy did not announce his presence when he first knocked on the door, he "loudly said, 'Sheriff's Office, open the door,'" the second and third times that he knocked on the door, Doc. 2 at 6 (describing what is depicted on the deputy's body camera video).

[9] The complaint asserts that Mr. Fortson was "unarmed … when his life was taken by [the deputy]," Doc. 1 at ¶16 (emphasis added), but that is incorrect because as the complaint later alleges (id. at ¶¶31, 32, 34, 35) and the investigative report attached to the complaint confirms, Doc. 2 at 7-8, Mr. Fortson was armed when he opened the door. That said, the mere fact that Mr. Fortson was armed when he opened the door does not necessarily mean that he posed a threat to the deputy that justified the deputy's use of deadly force.

[10] The complaint alleges that Mr. Fortson "received no immediate medical aid," Doc. 1 at ¶36, but that allegation is refuted by the investigative report attached to the complaint, which shows that the deputy who shot Mr. Fortson radioed for EMS about 10 seconds after the last shot (and again 24 seconds later telling EMS to "step it up") and two other deputies were "rendering aid to Mr. Fortson" about 90 seconds after the last shot, see Doc. 2 at 8-9 (describing what is depicted on the deputies' body camera videos).

After the incident, the Sheriff's Office conducted an investigation and issued a 29-page report finding that the deputy's use of deadly force against Mr. Fortson was not objectively reasonable. Shortly after the report was issued, the deputy was fired from the Sheriff's Office and charged with manslaughter for shooting Mr. Fortson. The deputy's criminal case remains pending.

## Standard of Review

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

When reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept the well-pled facts in the operative complaint as true and view them in the light most favorable to the non-moving party. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678. Moreover,

"when exhibits attached to a complaint 'contradict the general and conclusory allegations of the pleading, the exhibits govern.'" *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007)).

**Analysis**

Under Florida law, there is a "qualified privilege" for reporting suspected criminal activity to law enforcement. *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 12 (Fla. 2016). The privilege is rooted in the public policy of encouraging citizens to report crimes without fear of liability for doing so if it turns out that the information they reported was inaccurate. *Id.* at 10 (quoting *Pokorny v. First Federal Savings & Loan Ass'n of Largo,* 382 So. 2d 678, 682 (Fla. 1980)). The privilege is not absolute, and Florida recognizes "a cause of action for negligent reporting arises when [1] there is incorrect reporting plus [2] conduct on the part of the reporting party that rises to the level of punitive conduct." *Id.* at 11 (emphasis added).

"The conduct required to allege punitive conduct reaches beyond simple negligence," but is "less than intent or malice." *Id.* It is conduct that "demonstrates reckless, culpable conduct to the level of punitive damages." *Id.* at 14. "The character of negligence necessary to sustain an award of punitive damages must be of a gross and flagrant character, evincing reckless disregard of human life, or of the

8

safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them." *Id.* at 11 (quoting *Owens–Corning Fiberglas Corp. v. Ballard,* 749 So. 2d 483, 486 (Fla. 1999)) (cleaned up). Thus, "[w]hen the conduct in connection with reporting suspected criminal activity evinces a reckless disregard of the safety and rights of others [or] the parties involved either knew or should have known that their conduct was likely to cause harm, the qualified privilege cannot provide immunity to such behavior." *Id.* at 12.

    Here, although the complaint includes some of the requisite buzzwords and phrases—e.g., "willful," "wanton," "reckless," "grossly negligent," "utter disregard for the safety of Mr. Fortson"—the conduct of Ms. Doe described in the complaint and investigative report does not come close to meeting the standard of "punitive conduct." Indeed, based on Plaintiff's concession that Ms. Doe had no duty to investigate the information reported to her before conveying it to law enforcement, *see* Doc. 22 at 8, 10, it is hard to see how her conduct was even negligent.

    The circumstances of this case are markedly different from the cases in which courts have allowed negligent reporting claims to proceed. For example, in *Valladares*, the court held that the plaintiff had a viable negligent reporting claim

9

against the defendant bank because a bank employee not only made a mistaken report that the plaintiff was robbing the bank but she also failed to correct the report when she learned that the plaintiff was actually a bank customer. *See* 197 So. 3d at 13. Indeed, it appears that most of the cases in which courts have allowed negligent reporting claims to proceed involved the communication of information that the defendant knew or had reason to know was false. *See, e.g.*, *Aulicino v. McBride*, 2017 WL 2986192, at *3 (M.D. Fla. July 13, 2017) (denying motion to dismiss negligent reporting claim because two of the defendants not only falsely reported plaintiff for murder solicitation but they did so for the purpose of avoiding liability for their own murder solicitation offer to the plaintiff); *Goosby v. Branch Banking & Trust Co.*, 2017 WL 10442008, at *5 (S.D. Fla. Dec. 20, 2017) (denying motion to dismiss negligent reporting claim against the defendant bank because a bank employee falsely reported that the bank confirmed that plaintiff presented a fake check and a difficult to read driver's license and that the plaintiff attempted to enter the employee's office even though the employee had never seen the check or the license and he knew plaintiff was not attempting to enter anyone's office); *Clarke v. Phelan*, 2017 WL 4326522, at *8 (S.D. Fla. Sept. 28, 2017) (denying motion to dismiss negligent reporting claim against the defendant developer because the developer's employee concocted a story that plaintiff drove her car over a neighbor's

10

curb and then falsely reported the level of damage so the plaintiff would be charged with a felony).

Here, there is nothing in the complaint suggesting that Ms. Doe knew or should have known that there was not a potential domestic disturbance occurring in Mr. Fortson's apartment or that she had any reason to believe that the neighboring tenant's report to her about the disturbance was inaccurate when she relayed the report to law enforcement. Moreover, the investigative report attached to the complaint refutes the conclusory allegation that Ms. Doe's report to law enforcement "created a false sense of urgency" about the situation. Indeed, putting aside the fact that Ms. Doe called the non-emergency line, not 9-1-1, what she told law enforcement about the tenant who reported the incident to her "sound[ing] scared" because she thought that the disturbance "was getting out of hand" was consistent with what the tenant told the investigator who interviewed her after the incident.[11]

The circumstances might be different if Ms. Doe had affirmatively misrepresented or exaggerated either her knowledge of the situation or what she was told by the neighboring tenant, but the report attached to the complaint shows that is not what happened. Instead, Ms. Doe simply reported to police (1) what she had

---

[11] *See* Doc. 2 at 10 ("That's why I called, because it was concerning, because I was like, it's never been like this and I've been here for six months. … So, that's why it was kind of, concerning for me.") (quoting tenant's statements from the investigating officer's body camera video).

been told without vouching for its truth or falsity and (2) what she heard several weeks prior without misrepresenting that Mr. Fortson was involved in that situation.

The claims against Chez Elan are borderline frivolous because the complaint and its attachments establish that Ms. Doe did precisely what any concerned citizen *should* do under these circumstances: she called law enforcement, provided the information she had, and then let law enforcement investigate. From that point forward, whatever happened is on law enforcement, not Ms. Doe—or the apartment complex.

Moreover, dragging the apartment complex (and Ms. Doe) into this lawsuit contravenes the public policy underlying the reporting privilege and sends the wrong message to the public. It also undermines public safety because if "see something, say something" becomes "see something, say something, get sued," concerned citizens will be discouraged from reporting potential criminal activity or public safety issues to law enforcement. *See Pokorny*, 382 So. 2d at 682 ("Private citizens should be encouraged to become interested and involved in bringing the perpetrators of crime to justice and not discouraged under apprehension or fear of recrimination.") (quoting *Manis v. Miller*, 327 So. 2d 117, 117 (Fla. 2d DCA 1976)).

The Court recognizes that the applicability of the reporting privilege is typically a fact question based on the circumstances of the report to law enforcement, but that does not preclude dismissal where the facts alleged in the complaint do not

plausibly show that the privilege does not apply. *See Portes v. City of Doral*, 2025 WL 1865119, at *7-8 (S.D. Fla. July 7, 2025) (granting defendant's motion to dismiss plaintiff's negligence claim for false reporting because the facts in the amended complaint did not rise to the level necessary to overcome the qualified reporting privilege); *Harapeti v. City of Miami Beach*, 2024 WL 5442846, at *4 (S.D. Fla. Nov. 22, 2024) (same). Here, because the allegations in the complaint do not come close to showing conduct that rises to the level of "punitive conduct," Chez Elan cannot be held vicariously liable for the alleged negligent reporting of its employee. And, in the absence of any wrongful act of an employee, Chez Elan cannot be held liable for negligent supervision or training. *See Texas Skaggs, Inc. v. Joannides*, 372 So. 2d 985, 987 (Fla. 2d DCA 1979) ("[I]n order to impose liability on an employer for such torts, a plaintiff must first show that he was injured by the wrongful act of an employee."). Accordingly, the claims against Chez Elan in Counts 4 and 5 of the complaint are due to be dismissed.[12]

The dismissal of the claims against Chez Elan will be <u>with</u> prejudice because Plaintiff did not seek leave to file an amended complaint if the Court found any of the arguments in Chez Elan's motion to dismiss persuasive and the Court is not

---

[12] The Court did not overlook that Chez Elan sought dismissal of Counts 4 and 5 in their entirety, but it is doubtful that it has standing/authority to seek dismissal of the claims against Ms. Doe—or any other party. That said, the claims against Ms. Doe will likely be dismissed in due course for the same reasons that the claims against Chez Elan were dismissed. Indeed, the "negligence" claim against Ms. Doe in Count 4 is plainly deficient because the "punitive conduct" standard in *Valladares* requires more than simple negligence. *See Valladares*, 197 So. 3d at 11.

required to grant leave to amend sua sponte because Plaintiff is represented by counsel. *See Pop v. LuliFama.com, LLC*, --- F.4th ----, 2025 WL 2177719, at *8 (11th Cir. Aug. 1, 2025) (quoting *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002)). Moreover, the Court sees no reason to allow Plaintiff to re-assert its claims against Chez Elan in an amended complaint because any amendment would be futile under these circumstances. *See Watkins v. Dejesus*, 786 F. App'x 217, 219 (11th Cir. 2019) ("Dismissal with prejudice may be appropriate if granting leave to amend would be futile because the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant.").

## Conclusion

For the reasons stated above, it is **ORDERED** that:

1. Chez Elan's motion to dismiss, etc. (Doc. 14) is **GRANTED** insofar as the claims against Chez Elan in Counts 4 and 5 of the complaint are **DISMISSED with prejudice**.

2. Chez Elan's other pending motions (Docs. 24, 28) are **DENIED as moot**.[13]

---

[13] The issues raised in the motion for protective order (Doc. 28) may be asserted in an appropriate motion by one of remaining parties or in a third-party discovery motion, if necessary, although it is hard to understand how the identity of Ms. Doe and the tenant who reported the disturbance to her will not at least be discoverable because they presumably have information that is material to the claims and defenses in this case.

**DONE and ORDERED** this 11th day of August, 2025.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**